UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| ENRIQUE MATA, | No. C 08-4525 SI (pr) |
| Petitioner, | **ORDER DENYING PETITION FOR WRIT OF HABEAS CORPUS** |
| v. | |
| MICHAEL MARTEL, Warden, | |
| Respondent. | |

## INTRODUCTION

This matter is now before the court for consideration of the merits of Enrique Mata's pro se petition for writ of habeas corpus concerning his conviction in the Santa Clara County Superior Court. For the reasons discussed below, the petition will be denied.

## BACKGROUND

A Santa Clara County jury convicted Mata of four counts of forcible lewd acts on a child under 14 and one count of aggravated sexual assault on a child under 14. See Cal. Penal Code §§ 269, 288(b)(1). The trial court sentenced Mata to 39 years to life in prison.

Mata appealed. The California Court of Appeal affirmed the conviction in a reasoned opinion. The California Supreme Court denied his petition for review. Mata then filed his federal petition for writ of habeas corpus.

The following statement of facts is taken from the opinion of the California Court of Appeal.

Fifteen-year-old V. testified that when she was nine she lived with her mother, father,

sister, brother, sister-in-law and three male relatives, the twin brothers Adolfo and Rodolfo and 26-year-old Enrique Mata, the defendant. V. shared a bedroom with her sister but also slept in her parents' room. Defendant shared a bedroom with his cousins. The twins slept on the bed and defendant slept on the floor. Once or twice a week he slept in the living room.

Defendant began a campaign of seducing V. that culminated in several sexual assaults over a period of five or six months beginning in September or October of 1998. He started by touching her hair. Defendant showed her pornographic cards and magazines and told V. that someday she would look like the women in the pictures and he would perform on her the sex acts depicted in the magazines. Then, he began masturbating in front of her when they were alone together in the bedroom he shared with his cousins. Next, he began touching her breasts, which had begun to develop, over and under her bra. He also touched V.'s vagina, outside her clothing. Sometimes he kissed her while fondling her. He told her to touch his penis and on at least two occasions he physically moved her hand to his penis. After she removed her hand, he ejaculated. One time, he asked V. to put her mouth on his penis, but she refused. The assaults occurred in his room when V. was alone with him. Sometimes, she would go into the room herself; at other times, he would tell her to go to the room or say he would meet her there.

One night, when V. was in the kitchen getting a snack, defendant asked her to come into the living room where he was sleeping. She did so, and sat on the couch. He kneeled in front of her and removed her pajamas and underwear, pulled his erect penis out of his pants and put his penis inside her vagina. It hurt, and V. repeatedly asked him to stop, but he refused. He kept telling her it would feel good. He put his hand over her mouth to quiet her, saying that the others in the house would hear them. After that, she kept still, while he tried to put his penis inside her. It did not go in all the way. Finally, defendant removed his penis and masturbated to ejaculation. When he was through, she returned to her room.

A few weeks later, when she was lying on the bed in the room defendant shared with his cousins, defendant entered the room, closed the door and lay on top of her, forcibly rubbing his penis on her vagina over their clothing. She told him to get off her, but he refused. After a few minutes, V. got away.

V. never reported the assaults to anyone at the time because she was afraid, and because defendant would periodically tell her not to tell anyone or they would both get in trouble. A few months after the last assault, when V. was in fourth grade, she told her best friend S. that her cousin had raped her. V. asked S. to promise not to say anything. S. kept that promise until V. decided to tell everybody; at that point, S. told the police. During the same time period as the assaults, V.'s family noticed that she suddenly became hostile and rude towards defendant and said she did not like him. She tried to get out of visiting her brother's house after defendant went to live there. Around the time V. turned 10, in March of 1999, she became rebellious and started drinking and performing poorly in school. She attempted suicide twice. In October 2003, concerned about V's behavior, V.'s parents sent her to a boarding school in Mexico. Shortly thereafter, V. finally disclosed the sexual assaults to her parents and sister via email. The parents turned the emails over to police. V. was not interviewed by the police until January 27, 2004.

However, defendant was interviewed by the police in Spanish at the office of the sexual assault unit on January 13, 2004. The interview was videotaped, and the video recordings and transcripts of the interview were admitted into evidence. Detectives Juan Gonzalez and David Gonzalez (Det. J. Gonzalez, Det. D. Gonzalez) testified about the substance of the interview.

2

> Defendant said that V. was rebellious and had behavior problems at the time they all lived together. He described V. as having the mind of a 15 year old. She would seek him out. She would always look for ways to be alone with him. She may have watched him masturbate through a window that looked into the bathroom; she also hid in a closet and watched him masturbate. Once, she came into the bathroom while he was masturbating and took his towel. There were three or four times when he would enter the room and she would be sitting on the bed touching her private parts and would lift her shirt to show her breasts.
>
> She would jump on his back when he was lying down, and one time she yanked his penis. When she jumped on top of him, he would push her off and try to get away; he may have touched her breasts or vagina when he did that. He believed she wanted to have sex with him. One time when V. jumped on top of him, his underpants were down around his mid-thigh. He awoke feeling scared, and he didn't know if his penis was in her vagina, but he thought it was possible that V. might have penetrated her vagina using his penis. This happened twice.

Exh. C at 1-4.

The focus of Mata's habeas claim is the interrogation of Mata by detectives. The California Court of Appeal described the relevant facts:

> Prior to trial, during in limine motions, the prosecutor moved to introduce defendant's statements to police through the testimony of Det. J. Gonzalez. Defense counsel objected on Miranda grounds and moved to exclude them. An Evidence Code section 402 hearing was held on the admissibility of the statement.
>
> Det. J. Gonzalez testified that he is a certified bilingual speaker in Spanish and in English and that on the afternoon of January 13, 2004, he acted as interpreter between defendant and Det. D. Gonzalez during an interview in their office, the sexual assault unit. His "role was primarily as a translator, just to ensure that the defendant understood what Det[.] … D[.] Gonzalez was asking." (Footnote omitted.)
>
> Det. J. Gonzalez testified that defendant was not under arrest, handcuffed or shackled during the interview. He came of his own free will, just to talk, with a female companion. Det. J. Gonzalez asked defendant if he understood he was not under arrest and defendant indicated he understood. Det. J. Gonzalez told defendant that he was free to leave at any time, and asked defendant if he understood. He said that he did. He was not placed under arrest any time during the interview. At the end of the interview, defendant indicated that his companion had to leave and that he wanted to terminate the interview. At that time, they "walked out of the interview room and he just left."
>
> At one point during the interview, defendant said, "Yes, but you want me, by force, to say that it was me, that it was me." Det. J. Gonzalez responded, in Spanish, "No, no, no. [¶] … [¶] We want to know what you observed, what you saw." Det. J. Gonzalez acknowledged that at point in the interview, he and Det. D. Gonzalez were "trying to establish what the truth was and see what the suspect had to say about what had happened," and that defendant was "feeling the pressure of having to tell us the truth and he appeared nervous." However, they did not threaten the defendant in any way.
>
> At the end of the interview, defendant said he wanted to leave with his companion because he had to pick up his daughter in one hour. Det. D. Gonzalez asked him, "Can you wait a few minutes more?" According to Det. J. Gonzalez, at that time they were "in

the process of clarifying some facts. But when the defendant made it very clear that he needed to leave … he left." At one point, the defendant asked, "Have I been … locked in?" Det. J. Gonzalez then told defendant, in Spanish, "You can leave when you want to."

Det. D. Gonzalez admitted that during the interview, he told the defendant that "if you go to court you're going to look like a liar and then you'll have big problems" but he explained that he made that statement "[j]ust to reflect … his side of the story." Det. D. Gonzalez also told defendant that "[h]is chances [were] running out." Det. D. Gonzalez testified he meant that "it was very difficult to get a hold of the defendant. And his opportunity to have a Spanish translator … to explain his side of the story, this probably was the last time we'd actually speak with the detective and hav[e] me there to translate."

Det. D. Gonzalez also told defendant, "If you're not honest with us, there's going to be a lawyer talking to her, you understand?" and "That won't be good."

Following argument, the court ruled that the defendant was not in custody and his statements were voluntary.

Exh. C at 5-6.

## JURISDICTION AND VENUE

This court has subject matter jurisdiction over the petition for writ of habeas corpus under 28 U.S.C. § 2254. 28 U.S.C. § 1331. This action is in the proper venue because the challenged conviction occurred in Santa Clara County, within this judicial district. 28 U.S.C. §§ 84, 2241(d).

## EXHAUSTION

Prisoners in state custody who wish to challenge collaterally in federal habeas proceedings either the fact or length of their confinement are required first to exhaust state judicial remedies, either on direct appeal or through collateral proceedings, by presenting the highest state court available with a fair opportunity to rule on the merits of each and every claim they seek to raise in federal court. 28 U.S.C. § 2254(b), (c). State judicial remedies have been exhausted for the claims presented in the petition.

## STANDARD OF REVIEW

This court may entertain a petition for writ of habeas corpus "in behalf of a person in custody pursuant to the judgment of a State court only on the ground that he is in custody in

4

violation of the Constitution or laws or treaties of the United States." 28 U.S.C. § 2254(a). The petition may not be granted with respect to any claim that was adjudicated on the merits in state court unless the state court's adjudication of the claim: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States; or (2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." 28 U.S.C. § 2254(d).

"Under the 'contrary to' clause, a federal habeas court may grant the writ if the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the] Court has on a set of materially indistinguishable facts." Williams (Terry) v. Taylor, 529 U.S. 362, 412-13 (2000).

"Under the 'unreasonable application' clause, a federal habeas court may grant the writ if the state court identifies the correct governing legal principle from [the] Court's decision but unreasonably applies that principle to the facts of the prisoner's case." Id. at 413. "[A] federal habeas court may not issue the writ simply because that court concludes in its independent judgment that the relevant state-court decision applied clearly established federal law erroneously or incorrectly. Rather, that application must also be unreasonable." Id. at 411. A federal habeas court making the "unreasonable application" inquiry should ask whether the state court's application of clearly established federal law was "objectively unreasonable." Id. at 409.

## DISCUSSION

A.   Miranda Claim

Mata claims that his Fifth and Sixth Amendment rights were violated because he was not advised of his Miranda rights before a custodial interrogation.

On January 13, 2004, two members of the San Jose Police Department interviewed Mata. Exh. C at 3. Detective David Gonzalez was the primary interviewer and Detective Juan Gonzalez acted as the Spanish interpreter. Reporter's Transcript ("RT") 34-36. The interview

took place at the police department. RT 37. Mata came to the police station voluntarily in his own car with his wife. RT 37; Augmentation to the Clerk's Transcript ("ACT") 32-33. On arrival, Mata was told twice that he was not under arrest, that he was free to leave at any time, and he indicated that he understood. ACT 7. The interview then began with casual questions about Mata's family and his work, and Mata told the officers that he felt good about talking with them. ACT 1-6, 13.

During the interview, Detective David Gonzalez used two ruses. He told Mata that his saliva provided a DNA match with sperm found on the victim's underwear and that the victim's sister, Julissa, had seen Mata having sex with the victim. ACT 28, 34, 147. The detectives also made suggestions about what they thought happened. ACT 65-67, 87, 103-105, 108, 151, 170-175, 189-190, 193-194.[1] They encouraged Mata to tell the truth, told him that he wouldn't want to look like a liar if he went to court, called him a liar at certain points, and accused him of calling the victim a liar. ACT 5-7, 59-59, 81, 111, 168. When Mata said "You want me by force to say that it was me," Detective Juan Gonzalez responded with, "No, no, no." ACT 183. They also told Mata that they didn't believe him, and that they believed he had raped the victim. ACT 105, 155.

Mata explained that the victim acted promiscuously and like a rebellious teenager even though she was only nine years old at the time in question. ACT 19-20, 62-63, 77-81, 114-115. During the course of the interview, he also said that the victim would masturbate in front of him, that she walked in on him while he was masturbating, and that she had touched his penis. ACT 94-100, 123-125, 159-160. Mata admitted that the victim would jump on him and that he was frightened once when he woke up and found the victim on top of him with his underwear down. ACT 92, 182-184, 189-190. However, Mata consistently denied having ever penetrated the victim. ACT 102-103, 105-107, 110, 143-144, 151-152, 160-161, 165, 175-176, 179, 182-183.

---

[1] Detective David Gonzalez suggested how he thought the sexual assault occurred: "Here's what I think happened, okay, I think that she's probably a very promiscuous girl ... I think that she was very attracted to you and liked you ... she started saying that, you know, she liked you ... and maybe wanted to do things with you ... you didn't intend, you know, you didn't intend to have sex with her ... but it just happened." ACT 104-105.

The interview lasted approximately three hours, including three significant breaks. During the interview, the detectives offered Mata water. ACT 31. Detective Juan Gonzalez told Mata again, in the middle of the interview, that he was free to leave at any time. ACT 88. Mata could see his wife from the interview room and when Mata expressed concern about his car running out of time on the parking meter, he was allowed to send a message to his wife to tend to the meter. ACT 32-33. When Mata asked if he had been locked in, he was told that he was free to go. ACT 196. When Mata asked to rejoin his wife, Detective David Gonzalez said "okay" and requested that Mata answer one last question. ACT 196-197. Mata agreed and then left after a few more words were exchanged. ACT 196-197.

In Miranda v. Arizona, 384 U.S. 436 (1966), the Supreme Court held that certain warnings must be given before a suspect's statement made during custodial interrogation can be admitted in evidence. Miranda warnings are required "only where there has been such a restriction on a person's freedom as to render him 'in custody.'" Oregon v. Mathiason, 429 U.S. 492, 495 (1977). In determining whether someone is in custody, "the ultimate inquiry is simply whether there [was] a 'formal arrest or restraint on freedom of movement' of the degree associated with a formal arrest." California v. Beheler, 463 U.S. 1121, 1125 (1983) (quoting Oregon v. Mathiason, 429 U.S. at 495). It requires that a reasonable person would not "have felt he or she was not at liberty to terminate the interrogation and leave," given the totality of the circumstances. Thompson v. Keohane, 516 U.S. 99, 112 (1995).

Neither Miranda nor its Supreme Court progeny set down any bright line rule or specific test for determining when someone is in custody and instead suggest that the totality of the circumstances of each case must be examined to determine whether there was custody. See Yarborough v. Alvarado, 541 U.S. 652, 661-62 (2004). Because the Supreme Court's test for determining custody is a general standard, the range of reasonable judgment by a state court on this issue is broad. See id. at 663-64.

The Ninth Circuit has identified several factors relevant to the "in custody" determination:

> Pertinent areas of inquiry include [1] the language used by the officer to summon the individual, [2] the extent to which he or she is confronted with evidence of guilt, [3] the

7

physical surroundings of the interrogation, [4] the duration of the detention and [5] the degree of pressure applied to detain the individual. Based upon a review of all the pertinent facts, the court must determine whether a reasonable innocent person in such circumstances would conclude that after brief questioning he or she would not be free to leave.

United States v. Booth, 669 F.2d 1231, 1235 (9th Cir. 1981)(custody found where defendant knew that he was a prime suspect in the killing, and that he would be placed in jail later that day); see, e.g., United States v. Kim, 292 F.3d 969, 977-78 (9th Cir. 2002)(custody found where defendant was locked in with the police and her communication with those outside was restricted). However, these factors are not exhaustive, as other factors may be pertinent to, or even dispositive of, the custody question. See United States v. Bassignani, 560 F.3d 989, 996 (9th Cir. 2009) (applying above factors and finding no custody where police interviewed employee for over two hours in office conference room). In Mathiason, the Court acknowledged that the environment at the police station was coercive, but that Miranda does not apply simply because a coercive atmosphere exists. Mathiason, 429 U.S. at 495. Importantly, the Court has several times found no custody where the defendant went to the police station voluntarily and left freely after questioning. See Stansbury v. California, 511 U.S. 318 (1994); Beheler, 463 U.S. 1121; Mathiason, 429 U.S. 492.

      The California Court of Appeal applied People v. Aguilera, 52 Cal. App. 4th 1151 (1996), to determine whether custody existed. The court denied Mata's Miranda claim:

> Here, some of the circumstances listed in Aguilera do support defendant's contention that he was in custody at the time of the interrogation. These are: he was interrogated for three hours; the interview was, at times, intense, persistent, aggressive, confrontational, and accusatory; he was told that the police had evidence to prove his involvement (semen on the underpants, the sister's observation of defendant and the girl), even though it was not true.
>
>       However, as we noted in Aguilera, "[n]o one factor is dispositive. Rather, we look at the interplay and combined effect of all the circumstances to determine whether on balance they created a coercive atmosphere such that a reasonable person would have experienced a restraint tantamount to an arrest." (People v. Aguilera, supra, 51 Cal.App.4th at p. 1162.) In our view, the balance of the remaining factors supports the trial court's finding that a reasonable person in defendant's position would not have felt that he was in custody and restrained from leaving the detectives' office at any time he so wished. First, although the police initially called defendant, he came to the interview of his own volition, and with his wife, who provided him with an independent means of leaving whenever he wanted to do so.

8

> Second, although the police must have considered him a suspect, they had not yet interviewed V., and the detectives did not tell defendant he was a suspect. The setting was not a locked room in the police station but the detectives' office at the sexual assault unit. Defendant was told three times that he was not under arrest and was free to leave. As we noted in Aguilera, such advice is "a significant indication that the interrogation remained noncustodial," even though "a suspect repeatedly denies criminal responsibility and the police reject the denials, confront the suspect with incriminating evidence, and continuously press for the 'truth.' " (Aguilera, supra, 51 Cal.App.4th at p. 1164, fn. 7.)
>
> Furthermore, while it is true that two of the times defendant was told he was free to leave occurred at the beginning of the interview, the third time was during a lengthy break while defendant waited for the police to obtain and then test the cotton swabs for the purported DNA comparison. Throughout the interview, defendant never asked to leave, even when the questioning became pointed and accusatory, except at the very end, when he left. Defendant was not threatened by police. Defendant did not, in fact, confess, although his many exculpatory explanations were in fact admissions. Instead, he denied that he raped V. and maintained throughout the interview that he never intentionally penetrated her.
>
> And finally, he was not, in fact, arrested at the end of the interview but was permitted to leave with his wife, despite his admissions. Accordingly, we conclude that the interview was not a custodial interrogation for which Miranda advisements were required.

Exh. C at 11-12.

The state appellate court's determination that Mata was not in custody when questioned was not an unreasonable determination in light of the totality of the circumstances. On the one hand, some facts weigh in favor of a finding that Mata was in custody. Mata was interviewed by two detectives at the police department for three hours. The detectives used two ruses to try to get Mata to confess, suggested to Mata what they thought had happened, and said that Mata was lying. On the other hand, other facts weigh in favor of a finding that Mata was not in custody. Mata came to the police station voluntarily for a pre-arranged meeting. While the interview was three hours long, it included three breaks and some of the time was spent in non-confrontational conversation. Mata was told multiple times that he was free to go, he was able to send a message to his wife, and could even see her from the interview room. When Mata said he thought he was being forced to say something, he immediately was told that he was not. There was no formal arrest or physical restraint on freedom of movement. The state court's decision that Miranda warnings were not required because there was no custody was neither contrary to nor an unreasonable application of clearly established federal law.

B.   Ineffective Assistance of Counsel

Mata claims his Sixth and Fourteenth Amendment rights to effective assistance of counsel were violated when defense counsel failed to object to or move to suppress Mata's involuntary statements to detectives.

The Sixth Amendment right to counsel guarantees not only assistance, but effective assistance, of counsel. Strickland v. Washington, 466 U.S. 668, 686 (1984). The benchmark for judging any claim of ineffectiveness must be whether counsel's conduct so undermined the proper functioning of the adversarial process that the trial cannot be relied upon as having produced a just result. Id. In order to prevail on a Sixth Amendment ineffectiveness of counsel claim, petitioner must establish two things. First, he must establish that counsel's performance was deficient, i.e., that it fell below an "objective standard of reasonableness" under prevailing professional norms. Strickland, 466 U.S. at 687-88. Second, he must establish that he was prejudiced by counsel's deficient performance, i.e., that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." Id. at 694. A reasonable probability is a probability sufficient to undermine confidence in the outcome. Id. If a petitioner cannot show prejudice, then the court need not consider whether counsel's performance was deficient. See Williams v. Calderon, 52 F.3d 1465, 1470, n.3 (9th Cir. 1995).

A lawyer need not file a motion that he knows to be meritless on the facts and the law. See Wilson v. Henry, 185 F.3d 986, 990 (9th Cir. 1999) ("to show prejudice under Strickland from failure to file a motion, [petitioner] must show that (1) had his counsel filed the motion, it is reasonable that the trial court would have granted it as meritorious, and (2) had the motion been granted, it is reasonable that there would have been an outcome more favorable to him"); Lowry v. Lewis, 21 F.3d 344, 346 (9th Cir. 1994) (failure to file suppression motion not ineffective assistance where counsel investigated filing motion and no reasonable possibility evidence would have been suppressed); see also Rupe v. Wood, 93 F.3d 1434, 1445 (9th Cir. 1996) (failure to take futile action can never be deficient performance).

Here, to establish his entitlement to relief on the ineffective assistance of counsel claim, Mata must show that, had counsel objected (or filed a motion to suppress), his objection would have been sustained (or his motion granted), and a reasonable probability that the result of the proceedings would have been different. Whether counsel was ineffective turns on whether Mata's confession was involuntary.

The California Court of Appeal denied petitioner's claim:

> Viewing the totality of the circumstances, we conclude after a careful and independent review of defendant's interview that defendant's statements were voluntary and not motivated by police tactics or psychological coercion. (People v. Kelly, supra, 51 Cal.3d at p. 953.) Initially we note that "[a]ny interview of one suspected of a crime by a police officer will have coercive aspects to it, simply by virtue of the fact that the police offer is part of a law enforcement system which may ultimately cause the suspect to be charged with a crime." (Oregon v. Mathiason (1977) 429 U.S. 492, 495, 50 L. Ed. 2d 714.) Yet, this fact does not render admissions or confessions involuntary. Moreover, in this case, much of that inherent coerciveness of a police interview was mitigated by the fact that the interview was not conducted in the jail, and defendant's wife brought him to the interview, waited for him while he was interviewed, and then departed with him when the interview was over.
>
> Additionally, as the Attorney General points out, the use of deceptions and ruses to convince the suspect that the police have evidence that ties him to the crime, does not invalidate a confession, although it is a factor suggestive of coercion. (People v. Esqueda (1993) 17 Cal.App.4th 1450, 1484; People v. Parrison (1982) 137 Cal.App.3d 529, 187 Cal. Rptr. 123 [gunshot residue]; People v. Watkins (1970) 6 Cal.App.3d 119, 85 Cal. Rptr. 621 [fingerprints].) We have already determined that the uses of ruses and other investigative techniques did not render the interview "custodial" in this case. In our view, the tactics employed here by the police were not so coercive that they overbore the defendant's will.
>
> Here, the police made no implied or express promises of leniency. (People v. Boyde (1988) 46 Cal.3d 212, 238, 250 Cal. Rptr. 83.) They did not threaten the defendant. To the extent that the police told defendant it would be better for him to tell the truth, but did not promise him leniency as a reward for telling the truth, this tactic was not improper. (People v. Belmontes (1988) 45 Cal.3d 744, 773, 248 Cal. Rptr. 126; People v. Esqueda, supra, 17 Cal.App.4th at p. 1484.)
>
> In sum, there is no reasonable probability that if defense counsel had argued defendant's admissions were involuntary, the trial court would have suppressed the statements on that ground. Therefore, ineffective assistance of counsel has not been established.

Exh. C at 13-14.

To determine the voluntariness of a confession, the court must consider the effect that the totality of the circumstances had upon the will of the suspect. Schneckloth v. Bustamonte, 412

U.S. 218, 226-227 (1973). "The test is whether, considering the totality of the circumstances, the government obtained the statement by physical or psychological coercion or by improper inducement so that the suspect's will was overborne." United States v. Leon Guerrero, 847 F.2d 1363, 1366 (9th Cir. 1988) (citing Haynes v. Washington, 373 U.S. 503, 513-14 (1963)).

Relevant factors in considering the totality of the circumstances include the existence of police coercion, the length of the interrogation, the location of the interrogation, the continuity of the interrogation, and the defendant's maturity, education, physical condition, and mental health. Withrow v. Williams, 507 U.S. 680, 693 (1993) (citations omitted). Courts have also considered as indicative of coercion the repeated and prolonged nature of the questions, e.g., Ashcraft v. Tennessee, 322 U.S. 143 (1944); the use of physical punishment such as the deprivation of food or sleep, e.g., Reck v. Pate, 367 U.S. 433 (1961); and the use of promises or threats of violence, e.g., Leon Guerrero, 847 F.2d 1363. However, "the significant fact about all of these decisions is that none of them turned on the presence or absence of a single controlling criterion; each reflected a careful scrutiny of all the surrounding circumstances." Schneckloth, 412 U.S. at 226.

Here, Mata claims that the questioning was "threatening," but the record reveals no threats. Pet. Attachment 2 at 1. Mata correctly asserts that the questioning was at times "confrontational," "accusatory," and may have been "intimidating," but there is nothing in the record to indicate that the aggressive questioning was of the type strong enough to overbear Mata's will. Id. Mata argues that the detectives suggested their hypotheses about how the crimes occurred and offered "excuses for petitioner's actions, overstating the strength of the case against petitioner, and employing the use of ruses and trickery in order to obtain an admission of guilt from petitioner." Id. However, the two ruses did not result in a confession and there is no indication from the record that they overbore Mata's will. "Of all the numerous varieties of police trickery, ... a lie that relates to a suspect's connection to the crime is the least likely to render a confession involuntary." Holland v. McGuire, 963 F.2d 1044, 1051 (7th Cir. 1992); see also People v. Parrison, 137 Cal. App. 3d 529, 537 (Cal. Ct. App. 1982) ("subterfuge per se is

12

not the same as coercive conduct"). The misstatements told to Mata were not of such a nature as to produce an untrue statement or to induce an innocent man to incriminate himself. In addition, the use of excuses and suggestion do not by themselves establish involuntariness in light of the other circumstances of the interrogation.

The interrogation was held at the police station, but the officers were dressed in plain clothes and Mata could see his wife from the interrogation room. More importantly, Mata came and left at will, he was told multiple times that he was free to leave, and he was not locked into the interrogation room. The interrogation lasted for three hours, but it included three significant breaks and ended when Mata expressed a desire to leave. Cf. Cunningham v. City of Wenatchee, 345 F.3d 802, 810-11 (9th Cir. 2003) (confession not coerced despite eight hour interrogation). Mata was an adult at the time of the questioning, and there is no evidence that he lacked sound physical or mental capacity. The police did not make promises or use threats of violence or physical punishment. Finally, while Mata did make some damaging admissions, he never confessed to the crimes. Rather, he maintained that he never raped or assaulted the victim. The fact that he continued to assert his will in this way until the end of the interrogation indicates that his will was not overborne. These facts show that Mata's statements were not made involuntarily. While some indicators of coercion exist, many other indicators show that Mata's will was not overborne. Under the totality of the circumstances test, Mata's statements to the detectives were voluntary.

For the reasons just stated, the coerced confession argument would not have succeeded. The ineffective assistance of counsel claim falls with the coerced confession claim. That is, it was not deficient performance to fail to challenge the confession as coerced and no prejudice resulted from not taking that futile action. Mata is not entitled to the writ on this claim.

/ / /

/ / /

**CONCLUSION**

For the foregoing reasons, the petition for writ of habeas corpus is DENIED. The clerk shall close the file.

IT IS SO ORDERED.

DATED: October 28, 2009

_____
SUSAN ILLSTON
United States District Judge